# In the United States Court of Federal Claims

No. 13-58C

(Filed Under Seal: May 17, 2013)

(Reissued for Publication: May 28, 2013)[1]

*******************************************
|                                          | *  |
| ---------------------------------------- | -- |
| DAVIS BOAT WORKS, INC.,                  | *  |
|                                          | *  |
| Plaintiff,                               | *  |
|                                          | *  Post-award Bid Protest; U.S. Coast |
| v.                                       | *  Guard Procurement for Cutter Boat |
|                                          | *  Maintenance and Repair Services; |
| THE UNITED STATES,                       | *  Challenge to Agency's Reevaluation |
|                                          | *  of Proposals After Corrective Action; |
| Defendant,                               | *  Equal Treatment of Offerors; |
|                                          | *  Clarification of Proposals; Lack of |
| and                                      | *  Prejudice From Agency's Minor |
|                                          | *  Errors. |
| BMT DESIGNERS & PLANNERS, INC.,          | *  |
|                                          | *  |
| Defendant-Intervenor.                    | *  |
|                                          | *  |

*******************************************

*James E. Krause*, Law Office of James E. Krause, Jacksonville, Florida, for Plaintiff.

*William J. Grimaldi*, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Martin F. Hockey, Jr.*, Assistant Director,

---

[1] The Court issued this decision under seal on May 17, 2013 and invited the parties to submit proposed redactions of any competition-sensitive, proprietary, confidential, or other protected information on or before May 24, 2013. The parties jointly proposed that the Court redact certain sensitive procurement information, namely (1) the names of two of Plaintiff's employees, and (2) the name of a proposed subcontractor. The parties further propose that, for the sake of readability, the Court replace the employees' names with "Mr. A" and "Mr. B," respectively, rather than simply redact their names. The Court adopts this proposal, and also accepts and applies the parties' other limited proposed redactions, which are indicated in the decision by brackets and three asterisks, [* * *].

U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for Defendant.

*Daniel S. Koch*, with whom were *Joseph G. Billings* and *Rita J. Piel*, Miles & Stockbridge PC, Rockville, Maryland, for Defendant-Intervenor.

<u>OPINION AND ORDER</u>

WHEELER, Judge.

In this post-award bid protest brought under 28 U.S.C. § 1491(b)(1), Plaintiff Davis Boat Works, Inc. challenges the United States Coast Guard's proposal evaluation process in a procurement for inspection, maintenance, repair, and storage of a fleet of cutter boats. The parties have cross-moved for judgment on the administrative record, pursuant to Rule 52.1(c) of the Court's rules ("RCFC"). For the reasons set forth below, the Court finds that Davis has failed to establish its entitlement to relief on any of the protest grounds alleged. Accordingly, the Court denies Davis's motion for judgment on the administrative record, and grants the Government's cross-motion for judgment on the administrative record.

<u>Background</u>

On March 19, 2012, the United States Coast Guard ("USCG") issued Solicitation No. HSCG40-12-R-50008 for "the retrieval, inspection, maintenance, repair/refit, testing, storage, and transportation for a rotating pool of up to 33 Cutter Boat Over-The-Horizon (CB-OTH) MKIIs and MKIIIs and trailers to support Coast Guard cutters throughout the United States." Administrative Record ("AR") 96. Under the pre-solicitation operations for the USCG's Cutter Boat management program, the USCG assigns each "Major Cutter" a set of accompanying Over-The-Horizon Cutters ("OTHs"), with the result that "[w]hile the parent Cutter is in port, or in programmed depot maintenance the assigned Cutter Boat(s) [*i.e.*, the OTHs] remain idle, and not utilized for operational service." <u>Id.</u> 244. Using this program, the USCG seeks to improve the readiness of its fleet and achieve cost and efficiency savings by moving the OTHs "into a centralized pooling system in which the boats are centrally maintained and stored at a contractor's facility…. [and] transported to Major Cutters to meet operational needs as determined by the Coast Guard." <u>Id.</u> The goal of these planned changes, known as the Centralized Cutter Boat Pool ("CCBP") strategy, is to "decrease the number of active [OTHs] the Coast Guard requires while simultaneously increasing the number of hours each boat in the pool is available for deployable operations." <u>Id.</u>

The solicitation states that the procurement is for a "non-commercial fixed-price Requirements contract with time-and-material [contract line items, or 'CLINs'] consisting of one (1) base year and four (4) option years." <u>Id.</u> 96. However, the USCG

specified that for the first six months of the contract, the program would operate on a "pilot" basis, and cover only 16 boats. Id. 244. The USCG added that "[t]he Contractor should expect an average of 7 and up to 10 boats in storage/maintenance at any time during the duration of the pilot," but that "[d]epending on the success of the 6-month pilot period, it is anticipated that the number of boats will start to increase incrementally," up to 33. Id. To accommodate the USCG's anticipated storage needs, the Final Specification required that "[t]he Contractor's facility must be indoor and climate controlled, capable of storing up to 16 boats on trailers." Id. 252.

The USCG advised prospective offerors that it would award the contract "to the offeror whose proposal provides the best overall value to the Government." Id. 222. The solicitation's evaluation criteria consisted of three factors: (1) Technical Capability; (2) Past Performance; and (3) Price. Id. 223-24. The Technical Capability factor consisted of five subfactors, listed in descending order of importance: (1) Management Approach; (2) Teaming Arrangement/Subcontractors; (3) Quality Assurance Plan; (4) Staff Experience and Key Personnel; and (5) Facilities/Equipment. Id. 223.[2]

The USCG explained in the solicitation that it would perform a price reasonableness analysis by comparing the prices of all offerors "with the government's estimate and historical and market research results." Id. 224. In describing the relative importance of the evaluation criteria, the USCG stated that "[t]echnical capability is more important than past performance," and that "[w]hen combined, the non-cost factors are significantly more important than … price." Id. 222.

The USCG received proposals from seven offerors in response to the solicitation, including Davis Boat Works, Inc. ("Davis"), BMT Designers & Planners, Inc. ("BMT"), and Crowley Technical Services LLC ("Crowley"). AR Tabs 25-38. The USCG conducted an evaluation of these proposals, AR Tabs 39-45, and requested clarifications from some of the offerors, AR Tabs 46-50.

On August 21, 2012, the USCG awarded the contract to BMT. AR 4206. Following a debriefing, Crowley filed a bid protest at the Government Accountability Office ("GAO"), but the GAO dismissed this protest as untimely. AR Tabs 98, 101. Crowley then filed an action in this Court. AR Tab 102; Crowley Tech. Servs., LLC v. United States, Fed. Cl. No. 12-732C. In response to this suit, on November 8, 2012, Defendant agreed to take corrective action by having the USCG reevaluate the proposals it had received under the solicitation, and issuing a new source selection decision. AR

---

[2] The solicitation's evaluation subfactors were potentially confusing because the subfactors were listed in a different descending order on the same page. AR 223. The solicitation first listed the subfactors in the order stated in the main text above, but then included a brief description of each subfactor in the following different order: (1) Facilities/Equipment; (2) Management Approach; (3) Staff Experience and Key Personnel; (4) Teaming Arrangement/Subcontractors; and (5) Quality Assurance Plan. Id. In Amendment 0001, the USCG clarified that the order of importance in the main text governed. AR 282.

4688-89.  Crowley voluntarily dismissed the case without prejudice shortly thereafter. Id. 4690.

At the conclusion of the reevaluation, the USCG again concluded that BMT's proposal contained a superior technical solution and would, on balance, provide the best value to the Government.  Id. 4558-59.  With respect to the merits of Davis's proposal, as compared to BMT's, the Contracting Officer ("CO") stated:

> Davis Boat Works submitted the lowest total evaluated price of all Offerors[;] however[,] they only received an overall rating of marginal.  While [Davis] received a superior rating for quality assurance, [it also] received a rating of good for management approach; satisfactory for teaming arrangements; marginal for staff experience; and marginal for facilities.  [Its] past performance was rated as significant confidence.  The weaknesses with [its] technical proposal and the prices proposed indicate an overall lack of understanding of the program requirements.  Although BMT's total evaluated price is higher, [its] superior technical proposal offers a better value to the Government.

Id. 4558.

The USCG again selected BMT for contract award, and on January 23, 2013, Davis filed the present bid protest.  Davis asserts that the USCG did not evaluate proposals in accordance with the solicitation's evaluation criteria, and did not treat all offerors equally.  In particular, Davis questions the manner in which the USCG modified its rating of proposals in the second evaluation.  After the parties cross-moved for judgment on the administrative record, the Court held oral argument on May 7, 2013.

## Discussion

### I. Jurisdiction

This Court has jurisdiction over post-award protests pursuant to the Tucker Act, 28 U.S.C. § 1491.  Specifically, 28 U.S.C. § 1491(b)(1) provides this court with the authority "to render judgment on an action by an interested party objecting to … a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded."  Id. However, as a threshold jurisdictional matter, the plaintiff in a bid protest must show that it has standing to bring the suit, i.e., that it is an "interested party" within the meaning of Section 1491(b)(1).  Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369-70 (Fed. Cir. 2002) (internal citation omitted).

The Federal Circuit has defined an "interested party" as an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract," Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2)); see also Distributed Solutions Inc. v. United States, 539 F.3d 1340, 1344 (Fed. Cir. 2008); Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006). In the post-award context, a plaintiff must satisfy a two-part test to be an interested party. First, plaintiff must demonstrate that it is an actual or prospective bidder or offeror. Rex Serv. Corp., 448 F.3d at 1307. Second, the plaintiff must demonstrate that it has suffered prejudice as a result of the procurement outcome, id., which, in turn, requires a showing that "but for the error, [the plaintiff] would have had a substantial chance of securing the contract." Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (internal citations omitted); Rex Serv. Corp., 448 F.3d at 1307. At the standing stage, the Court "assumes all non-frivolous allegations to be true[.]" Orion Tech., Inc. v. United States, 102 Fed. Cl. 218, 226 n. 10 (2011) (internal citation omitted).

The Government does not dispute that Davis, as a qualified offeror whose proposal was found to be technically acceptable and within the competitive range, has standing as an "interested party" with a direct economic interest in the award of the contract. The Court finds that Davis was an actual offeror with a direct economic interest in the procurement, and therefore has standing to bring this suit.

I.  Legal Standard

In a bid protest, a court reviews an agency's procurement actions under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which provides that a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id.; see also, e.g., Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (internal citation omitted). Under this standard, "[a] bid protest proceeds in two steps." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the Court determines whether a procurement decision either (a) lacked a rational basis, or (b) involved a violation of a statute or regulation. Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009). "A court evaluating a challenge on the first ground must determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." Id. (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001)).

The inquiry at this first step is "highly deferential," Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000), and *de minimis* errors in the

procurement process do not justify relief.  Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 1000 (Fed. Cir. 1996) (internal citations omitted); E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (noting that "[p]rocurement officers have substantial discretion to determine which proposal represents the best value for the government"); DynCorp Int'l LLC v. United States, 76 Fed. Cl. 528, 537 (2007) ("'[B]est value' contract awards give a contracting officer more discretion than awards based on price alone.") (citing Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004)).

Accordingly, "[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'"  Weeks Marine v. United States, 575 F.3d 1352, 1371 (Fed. Cir. 2009) (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989)).  In addition, while the Court "'may not supply a reasoned basis for the agency's action that the agency has not itself given,'" it must nonetheless "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" In re Applied Materials, Inc., 692 F.3d 1289, 1294 (Fed. Cir. 2012) (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) and Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974), respectively).

On the other hand, "[a] court must find an agency decision arbitrary and capricious if the government 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] was so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  BINL, Inc. v. United States, 106 Fed. Cl. 26, 36 (2012) (quoting Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  The protester carries the burden of proving that such an error marred the procurement in question.  CACI Field Servs., Inc. v. United States, 854 F.2d 464, 466 (Fed. Cir. 1988).

If the Court finds that the agency acted without a rational basis or contrary to law, it must then, at the second step, "determine… if the bid protester was prejudiced by that conduct."  Bannum, Inc., 404 F.3d at 1351.  "Prejudice is a question of fact," which the plaintiff again bears the burden of establishing.  Id. at 1353, 1358.  This prejudice determination is based on the same standard as the initial one made at the standing stage; however, at this step, the plaintiff must prove its allegations by a preponderance of the evidence.  Jacobs Tech. Inc. v. United States, 100 Fed. Cl. 198, 207 (2011); Sys. Applications & Techs, Inc. v. United States, 100 Fed. Cl. 687, 707 n.15 (2011).

Moreover, in reviewing a motion for judgment on the administrative record made pursuant to RCFC 52.1(c), the court determines "whether, given all the disputed and

undisputed facts, a party has met its burden of proof based on the evidence in the record." Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 355 (2009).  The existence of a material issue of fact, however, does not prohibit the Court from granting a motion for judgment on the administrative record, nor is the court required to conduct an evidentiary proceeding.  Id. ("In a manner 'akin to an expedited trial on the paper record,' the court will make findings of fact where necessary.") (quoting CHE Consulting, Inc. v. United States, 78 Fed. Cl. 380, 387 (2007)).

Thus, in order to prevail on the merits of its case, Davis must demonstrate by a preponderance of the evidence that, if not for errors in the USCG's proposal evaluation process, it "would have had a substantial chance of securing the contract." Labatt Food Serv., 577 F.3d at 1378.

II. Analysis

In its motion for judgment on the administrative record, Davis raises a number of protest grounds relating to the USCG's process in reevaluating the proposals it received in response to the solicitation.  First, Davis contends that the Government violated the Competition in Contracting Act ("CICA"), 10 U.S.C. § 2305(b)(1), by failing to "evaluate [the] proposals and make [its] award[] based on the criteria stated in the Solicitation." Pl. Mem. at 15.  Davis also argues that it was not treated equally with the other offerors.  As evidence for this assertion, Davis contends that it was downgraded in three categories, as compared to the scores it received in its initial evaluation.  Id. at 5-6.  Specifically, Davis alleges that the USCG failed to evaluate properly its stated capacity for boat storage, its reprioritization plan, its proposed teaming arrangements, and its price proposal.

Davis also questions the USCG's treatment of the proposal submitted by the chosen offeror, BMT.  Here, Davis contends that the USCG afforded an unfair advantage to BMT by giving it, and no others, the opportunity to "augment [its] proposal," Pl. Mem. at 6, and also that the USCG gave BMT preferential treatment in considering its proposed personnel.  Pl. Reply at 11-12.

The Court will address each of these arguments below.  For the reasons explained, the Court finds that Davis has failed to meet its burden on any of the protest grounds asserted.

A. The USCG's Evaluation of Davis's Proposal

1. The USCG Applied the Stated Evaluation Factors

Davis's first contention is that the USCG evaluated its proposal not on the basis of the factors specified in the solicitation, as required by CICA, 10 U.S.C. § 2305(b)(1), but

7

rather against the substance of other offerors' proposals. Pl. Mem. at 8. As the basis for this argument, Davis offers the sworn affidavits of its President, Frank Wagner, and Vice President, Algie Spurlock. Messrs. Wagner and Spurlock allege that in their post-award debriefing with the USCG, Contract Officer Kelly Wyatt stated repeatedly that Davis's proposal had been rated against the competing proposals, rather than against the terms of the solicitation itself. Wagner Aff. ¶ 7(e); Spurlock Aff. ¶ 7(d).

However, as the Government points out, these assertions are plainly belied by the administrative record, which contains clear evidence of the USCG's proposal evaluations. The record demonstrates that the USCG in fact evaluated both Davis and the other offerors against the standards set forth in the solicitation. See generally AR Tabs 75-88. Moreover, although Davis attached the Wagner and Spurlock affidavits to its opening brief, it never moved to supplement the administrative record with these documents. In reviewing cross-motions for judgment on the administrative record, the court is limited to the documents included in that record. Supplementation is permitted only upon a showing that "the omission of [specific] extra-record evidence precludes judicial review." Axiom Resource Mgmt., Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009). "The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the arbitrary and capricious standard into effectively de novo review.'" Id. (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000)). Since Davis failed to request that the Court permit the supplementation of the administrative record with the Wagner and Spurlock affidavits, they remain "extra-record" and beyond the scope of review in this case.

2. The Downgrade of Davis's Proposal Is Not Evidence of Unequal Treatment

Davis next alleges that the USCG retaliated against both it and Crowley in the second round of proposal evaluations for objecting to the agency's award decision following the first round. In Davis's words:

> [i]t is clear that Crowley, the Protester in the original protest, was downgraded in every single subfactor/category on reevaluation. It would be unreasonable to claim this is mere coincidence. This appears to be reprisal by the USCG for protesting, and establishes the probability of a Government action in which all the proposals were not graded fairly and reasonably according to the terms and conditions of the Solicitation. Not too surprisingly, Davis, [which] provided an affidavit in the first protest for Crowley, was downgraded in three categories, the second biggest loser in this re-evaluation. For this single reason, Davis requests this Contract be cancelled and resolicited ….

Pl. Mem. at 5-6.

The USCG interprets this argument as an allegation of bad faith. Gov't Mem. at 9. The Court agrees with this characterization, and also agrees that Davis has not provided compelling evidence to support its contention.

Even assuming that Davis was substantially downgraded in the reevaluation of proposals (an assertion the USCG contests), the Court finds this bare fact to fall far short of a showing of bad faith. As the Government notes, "[a]n agency is afforded the discretion to change its mind during the course of an evaluation." Gov't Mem. at 12 (citing G4S Tech. CW LLC v. United States, --- Fed. Cl. ---, 2013 WL 935890, at *13 (Fed. Cl. Mar. 12, 2013)). Indeed, the Court fails to understand what purpose a reevaluation would serve if the technical evaluation team could not change its mind. The Court will not infer bad faith from the fact that Davis received minor downgrades in certain categories during the second evaluation. Davis's allegations lack supporting evidence, and are without merit.

    3.  Davis Has Not Demonstrated that the USCG's Evaluation of Its Proposal Was Arbitrary, Capricious, or an Abuse of Discretion

Davis makes a number of arguments that the USCG failed to properly evaluate its proposal in the areas of its stated capacity for boat storage, its reprioritization plan, its proposed teaming arrangements, and its price proposal. The Court will address each of these grounds below.

    a.  Boat Storage Capacity

As noted, the USCG anticipated that during the six-month pilot program, it would require storage space for "an average of 7 and up to 10 boats in storage/maintenance at any time." AR 244. The solicitation stated an expectation that this number of boats would "increase incrementally," and that the USCG therefore required that "[t]he Contractor's facility … be indoor and climate controlled [and] capable of storing up to 16 boats on trailers." Id.; see also AR 362 (solicitation Questions and Answers, stating that "[s]torage needs to be available to accommodate 16 boats, even though the anticipated average number is well below this").

Davis challenges the USCG's determination that it lacks the requisite boat storage capacity. See AR 4527 (USCG reevaluation, finding that Davis's proposal "depicts room for 13 boats, vice the 16 required by the RFP"). First, apparently referencing the lesser storage requirements for the pilot period only, Davis argues that "[t]he storing of 16 boats at the same time was not a requirement of the solicitation." Pl. Mem. at 10. This argument contradicts the terms of the solicitation, as quoted above.

Second, Davis argues that its proposal did, in fact, identify the company's capacity to store the requisite 16 boats. Pl. Reply at 10-11. Here, Davis contends, in addition to

9

the space in its secure climate controlled storage building, the company also is able to make its tube and trailer repair shops, as well as its Inflatable Boat division facility available for additional storage in order to bring its proposal in line with solicitation requirements. Id. at 11. Davis further states that if the USCG had toured these additional buildings during its site visit, it would have realized that Davis could meet the storage requirements. Id.

However, as the Government points out, Davis's proposal makes no mention of the qualifications or capacity of these potential auxiliary storage facilities. Moreover, in its written clarification, Davis stated that its proposal "showed 14 OTH's." AR 4509. The Court agrees with the USCG that, under the terms of the solicitation, the responsibility to identify adequate storage capacity belonged to Davis, and not to the USCG inspectors performing a site visit. Id. 217 (solicitation submission requirements, providing that "[t]echnical proposals submitted in response to this Solicitation must demonstrate … the ability to meet all of the requirements covered in the Specification"); see also Software Eng'g Servs., Corp v. United States, 85 Fed. Cl. 547, 555 (2009) ("[I]t is well established that all offerors … are expected to demonstrate their capabilities in their proposals.") (internal citation omitted). Although the USCG's determination that Davis's proposal identified only 13 storage "slots" was apparently in error, see Gov't Reply at 4 (acknowledging that in its response to the USCG's request for clarification, Davis identified the capacity to store 14 boats), this error was without prejudice to Davis where the solicitation plainly required a storage capacity for 16 boats.

b. Reprioritization Plan

Davis asserts that the USCG "downgraded Davis because Davis did not provide for re-prioritization – which is NOT a requirement of this solicitation." Pl. Mem. at 8-9 (emphasis in original). However, the solicitation in fact stated: "[t]he Contractor shall prioritize work as to ensure at least one boat is ready for delivery at all times. The Contractor shall have a 'Ready Boat' designated at all times. Unless otherwise directed, this Ready Boat will be the next boat utilized for a boat delivery." AR 264.

Since Davis failed to address this requirement in its proposal, there was nothing improper in the USCG's decision to assign Davis a "minor weakness" for its omission. Id. 4525.

c. Teaming Arrangements / Subcontractors

Next, Davis argues that the USCG improperly downgraded it for proposing to subcontract only one percent of its electronics work under the contract, where the solicitation did not require offerors to subcontract any such work. Pl. Mem. at 9. The Government agrees that the solicitation did not contain subcontracting requirements or goals for this work, but contends that a lack of clarity in Davis's proposal regarding the electronics

portion of the contract led it to properly downgrade the company. Specifically, Davis's proposal stated that a particular subcontractor, [* * *], would perform "100%" of the necessary electronics work, "but less than 1% of [the] total contract." AR 3027. Because electronics work accounted for more than 1% of the total contract value, the USCG states that it perceived Davis as having less than perfect understanding of the contract's requirements. Accordingly, it downgraded the company's proposal.

The USCG review panel noted that:

> Davis's teaming arrangements listed 'less than 1%' for all the subcontractors, including Electronics … ELEX PMS alone constitutes more than 1% of the contract requirements and there is no indication in the proposal that Davis has in-house workers with ELEX experience. Although they have the resources to draw upon in their subcontractors, claiming that only 1% of the work is ELEX related demonstrated a lack of understanding of the contract requirements … and greatly increases the risk that Davis will fail to meet the contract requirements.

Id. 4526.

Davis contends that it always intended to perform the remaining electronics work itself, and that it has the capacity to do so. Pl. Mem. at 9. The Court agrees with the Government, however, that because the solicitation required Davis to state its capabilities *in its proposal*, the adverse consequences of an omission are properly Davis's responsibility. See Software Eng'g Servs., 85 Fed. Cl. at 555.

### d. Price Proposal

Davis raises various arguments regarding the USCG's evaluation of its price proposal, which was the lowest received. See AR 4576 (USCG's letter to Davis, noting Davis as the lowest bidder). First, Davis contends that the USCG improperly downgraded its proposal for its omission of a detailed price breakdown, with line items for specific categories of costs. Davis argues that under the terms of the solicitation, inclusion of this information was optional, and that after Davis failed to include it in its proposal, the USCG should have requested supplementation. Pl. Mem. at 10-11; Pl. Reply at 14.

Once again, Davis's contention is contradicted by the plain language of the solicitation. As relevant, the solicitation states "it is requested that you provide a breakdown of your costs, to include but not be limited to: Cost/hour/trade[;] Supplies/materials (description & cost of each[;] Sub-total[;] Pensions Plans[;] Overhead rate[; and] Profit[.]" AR 220. However, whether or not this language, and in particular, the use of the term "requested," can be construed as merely precatory in this context, the

USCG expressly clarified in the Question and Answer section that the inclusion of such information was *mandatory*. That section contains the following exchange:

> QUESTION: … Does the wording 'it is requested that you provide a breakdown of your costs' indicate that this is required, or may it be omitted? …
>
> ANSWER: Yes, it is required. No, it may not be omitted….

AR 296.

Further, in its Reply brief Davis relies on Preferred Systems Solutions, Inc. v. United States, 110 Fed. Cl. 48 (2013), apparently for the proposition that the USCG had an affirmative duty to clarify Davis's low price offer with the company before rejecting its proposal as failing to provide the best value to the Government. Pl. Reply at 14. But that case held only that an agency did not act arbitrarily when, *in its discretion*, it "recognized the potential for risk [in a low price proposal], consulted appropriate sources, and … concluded that the offeror's price was reasonable and realistic." Preferred Systems, 110 Fed. Cl. at 61. Preferred Systems imposes no affirmative duties on an agency, and indeed is not even on point to this case. It does not support Davis's position.

### B. The Coast Guard Did Not Improperly Favor BMT's Proposal

Finally, Davis makes two arguments that the USCG gave BMT preferential treatment. First, Davis contends that in the first round of evaluation, "[t]he USCG allowed BMT to augment [its] proposal without providing the same opportunity to the other Proposers." Pl. Mem. at 6. Second, Davis claims that the USCG gave unequal consideration to the work experience of certain BMT and Davis personnel. Pl. Reply at 11. The Court will address each of these arguments below.

#### 1. The Coast Guard Did Not Conduct Discussions with BMT

The Government does not dispute that in the circumstances of this solicitation, it was not permitted to afford BMT (or any offeror) an opportunity to amend or revise its proposal. However, the USCG argues that the BMT document about which Davis complains – a "Process Guide," discussed below – constituted a permissible clarification, not a substantive proposal revision.

The Federal Acquisition Regulation ("FAR") distinguishes between two types of actions in the proposal evaluation process: a "clarification" on the one hand, and a "negotiation" or "discussion" on the other. The former is a "limited exchange[], between the Government and [an] offeror[], that may occur when award without discussion is

contemplated," and which gives the offeror "the opportunity to clarify certain aspects of proposals … or to resolve minor or clerical errors." FAR § 15.306(a)(1)-(2).

In contrast, the FAR defines a "negotiation" or "discussion" as:

> [an] exchange[] … between the Government and offerors, that [is] undertaken with the intent of allowing the offeror to revise its proposal. These negotiations may include bargaining. Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract. When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions.

Id. § 15.306(d). Thus, as this Court recently recognized, "the term 'discussion' has a specific legal definition" in the government contracting context: "discussions involve negotiations and are undertaken with the intent of allowing the offeror to revise its proposal." G4S Tech., 2013 WL 935890, at *12 (quoting Galen Medical Assocs., Inc. v. United States, 369 F.3d 1324, 1332 (Fed. Cir. 2004)). Further, the "acid test for deciding whether discussions have been held is whether it can be said that an offeror was provided the opportunity to revise or modify its proposal." Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 717 (2010) (quoting DynCorp Int'l LLC, 76 Fed. Cl. at 541).

Nonetheless, as the Federal Circuit has emphasized, "[a]ny meaningful clarification would require the provision of information." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1323 (Fed. Cir. 2003) ("ITAC"). Thus, even "[i]f a response [to an agency's request for additional information] provides information essential to evaluation criteria, increases a past performance score[,] or tips the scales toward the offeror providing the clarification, it still may only be a clarification." DynCorp Int'l, 76 Fed. Cl. at 542 (citing ITAC, 316 F.3d at 1323). Finally, in close cases, it is well-established that the government's classification of a particular communication as a clarification or a discussion "is entitled to deference from the court," as long as that classification is permissible and reasonable. Linc Gov't Servs., 96 Fed. Cl. at 717; ITAC, 316 F.3d at 1323.

Here, Davis contends that a 25-page "Process Guide" submitted by BMT during the first round of evaluations in response to a USCG request for clarification goes beyond the limited definition of "clarification," and therefore afforded the company an unequal opportunity to engage in "discussions" with the agency. During the course of its first-round evaluation, the USCG sent BMT a letter seeking clarification on, *inter alia*, the company's proposed management approach. The letter stated:

13

> [Y]our proposal states 'proven processes … will ensure the USCG … is able to rely on BMT to complete the requested work scope' however nowhere in your technical proposal do you specify how you intend to meet the individual requirements of the specification.  Please clarify this statement as to your intent to meet specification requirements.

AR 3826.  In response, BMT sent the USCG a seven-page letter addressing this and other requests for clarification posed in the USCG's inquiry.  In addressing the management plan question in particular, BMT stated that it "will meet all specification requirements. To describe how we intend to meet these requirements, we have attached our DRAFT Process Guide for the Cutter Boat Pooling Program."  Id. 3824; see also id. 4692-716 (Process Guide).  In addition, the company included within its letter a two-page "summary response" addressing the USCG's question.  Id. 3823-24.

The Court agrees with the Government that Davis has not carried its burden of demonstrating that the Process Guide constituted a substantive revision to its proposal. As noted above, any clarification must necessarily convey new information to the agency, and the Court finds that the Process Guide did not cross the line between a clarification and a revision.  See ITAC, 316 F.3d at 1323.  The Court acknowledges that, considered *de novo*, this issue presents a somewhat close issue.  However, the Court also recognizes, as it must, the USCG's discretion in this area, and finds that, in any event, the USCG's classification in this instance was both permissible and reasonable.  See Linc Gov't Servs., 96 Fed. Cl. at 717; ITAC, 316 F.3d at 1323.  Accordingly, this protest ground also fails.

>    2.   The Coast Guard's Error in Evaluating BMT's Key Personnel Did Not Prejudice Davis

In its opening brief, Davis argued that the USCG had improperly assigned it a "marginal" rating for that portion of its proposal relating to the Staff Experience and Key Personnel sub-factor.  As relevant here, Davis had proposed [Mr. A] as the Program Manager for the contract, and [Mr. B] as Site Foreman and Planner/Estimator.  AR 3022. The USCG rated this portion of Davis's proposal "marginal" for three reasons.  First, the USCG expressed concern that [Mr. A], who already managed Davis's entire Inflatable Boat Division, would be "stretched thin" if he were to fill the CCBP Program Manager role.  AR 4526.  Second, the USCG noted that [Mr. B's] two years as a foreman and eleven years of more generalized experience "working on government small craft" fell short of the minimum required experience for *both* (1) the Planner/Estimator position, which required a "minimum of 5 years in boat or ship productions," *and* (2) the Site Foreman position, which required a "minimum of 3 years experience in boat or ship repair as a foreman or [in a] leadership position."  Id.; see also id. 250.

14

Davis originally took issue with this assessment on two grounds.  First, it argued that its personnel were not required to "remain idle while the Government performs a source selection."  Pl. Mem. at 9.  Second, Davis argued that the "USCG misread the resume of [Mr. B] … and downgraded Davis's Planner/Estimator for no experience in boat production.  Since this was a repair solicitation Davis reasonably interpreted the requirements as ship or boat repair production, not new boat production."  Id.

The Government, for its part, responded that "it was within the USCG's discretion to determine that [Mr. A's] dual roles would cause a risk of noncompliance with the Specification," and that "to the extent that Davis now claims [Mr. A] would have relinquished his [other] role … after award, this is a *post hoc* revision" not contained within Davis's proposal.  Gov't Mem. at 19-20.  The Government further argued, *inter alia*, that Davis had failed to explain how the USCG had misperceived [Mr. B's] two years of relevant leadership of foreman experience, which was short of the three required years under the terms of the solicitation.  Id. at 20.

Apparently perceiving its weaknesses, Davis dropped the personnel argument entirely in its reply brief, and instead alleged, for the first time, that BMT's proposed Planner/Estimator *also* lacked any "new" boat or ship production experience and [that] no mention was ever made of that fact."  Pl. Reply at 11.  To the contrary, as Davis points out, the USCG evaluated BMT's proposed staff as "all exceed[ing] minimum requirements[.]"  Id. at 11-12 (quoting AR 4323).  According to Davis, "[t]his evidences the unequal and unfair treatment of the Offerors' [sic]."  Id. at 11.

At this point, the Government concedes that "[u]pon review of the administrative record, it appears that although BMT's proposed Planner/Estimator does not possess the solicitation's required experience," the USCG found the opposite to be the case.  Gov't Reply at 17.  Nonetheless, the Government contends that this error:

> could not have prejudiced Davis because it could not have [had] any impact upon the trade-off decision which eliminated Davis from the competition…. Davis's 'overall lack of understanding of the program requirements' would not have changed.  Rather, [such a revision] could only have impacted BMT's rating of 'Superior' in one subfactor…. It would have had no effect upon the weaknesses in Davis's proposal, which led to a finding of a lack of understanding: *i.e.*, its 'risky' teaming arrangements, the lack of experience not only for its Planner/Estimator, but also the lack of experience for its Site Foreman, the potential for distraction for its Program Manager, its failure to propose a facility that meets the solicitation's requirements, and its risky low price.

Id. at 18-19.

15

As explained above, Davis bears the burden of establishing, by a preponderance of the evidence, that "but for the error, [it] would have had a substantial chance of securing the contract." Labatt Food Serv., Inc., 577 F.3d at 1378; Jacobs Tech. Inc., 100 Fed. Cl. at 207.  The Court agrees with the Government that, due to the other demonstrated weaknesses in Davis's proposal, Davis cannot meet this standard.

Conclusion

In summary, none of Davis's arguments comes close to establishing its entitlement to relief on the merits of its protest.  This is especially so where, as Davis itself acknowledges, "[t]he court must especially defer to the agency's technical evaluations … and other minutiae of the procurement process … which involve discretionary determinations of procurement officials."  Pl. Mem. at 18-19 (quoting E.W. Bliss Co., 77 F.3d at 449); see also DynCorp Int'l, 76 Fed. Cl. at 537 (noting that "'best value' contract awards give a contracting officer more discretion than awards based on price alone.") (citing Galen Medical Assocs., Inc., 369 F.3d at 1330).  Further, while the USCG admits error in its evaluation of awardee BMT's personnel proposal, this error was without prejudice to Davis.

Accordingly, the Court DENIES Davis's motion for judgment on the administrative record, and GRANTS the Government's cross-motion for judgment on the administrative record, in which Intervenor-Defendant BMT joins.  No costs.

This decision is filed under seal.  On or before May 24, 2012, counsel for the parties shall carefully review this opinion for competition-sensitive, proprietary, confidential, or other protected information and submit to the Court any proposed redactions before the opinion is released for publication.

IT IS SO ORDERED.

s/Thomas C. Wheeler<br>THOMAS C. WHEELER<br>Judge